Good morning ladies and gentlemen. Our first case for argument this morning is United States v. Gay. Ms. Zheng. Thank you, Your Honor, and may it please the Court, Breanne Zhang on behalf of Appellant Anthony Gay. Mr. Gay was tried twice. Ms. Zheng, we'd appreciate it if you'd Mr. Gay was tried twice before a jury. The government's factual presentation was very similar between the first and the second trial. The defense case was not. So today we'd like to focus on two issues. First, the evidence presented at the second trial. The district court erroneously excluded key exculpatory testimony from the second trial, and those errors denied Mr. Gay his constitutional right to present a complete defense. To the first point, what the evidence boils down to is that Mr. Gay was in close proximity to contraband, which the court has repeatedly held is insufficient to establish a finding of possession. The only evidence the parties can all agree on is that a gun was recovered in an area where Mr. Gay briefly traveled through. It was a public area. He had no connection to the location where the gun was found or control over the premises. And again, mere presence, mere proximity is not enough. There has to be something else. In this case, the forensic evidence does not corroborate Mr. Gay's possession of the gun. Ms. Zheng, if I could interrupt, one of the most striking facts about this case, in my view, is the fact that the firearm was loaded with two different kinds of ammunition. And both of those kinds of ammunition were found two weeks later in a hotel room, where the defendant had been staying. If the ammunition comes in, that seems like pretty strong circumstantial evidence tying him to the firearm. So I wonder if you could address the hotel room. Sure, Your Honor. We want to be clear that these are two separate charges based on the ammunition located in the hotel room. We understand they're two separate charges, but that coincidence is significant. Of course. So we would just emphasize that the ammunition was found two weeks or more after we know Mr. Gay was last in the room, which we think is insufficient to connect him to the firearm. I think it's enough to say that it's the same type of ammunition. It's a very common caliber from very popular manufacturers that was found in the gun. At most, it may be suspicious, but as this court has held, the presence of suspicious evidence is not enough to support a finding of guilt beyond a reasonable doubt. And even absent the unlawful search, which according to the Patels, found in a drawer where Mr. Patel testified he could not remember a single item belonging to Mr. Gay. And again, we just emphasize the amount of time that passed between when the firearm was recovered and when the ammunition was recovered. I also think that the witness testimony in this case about Mr. Gay's conduct on the night of his arrest does not support a conviction. To be clear, we're not talking about question of witness credibility or conflicting witness accounts. These are facts that are depicted in the video evidence. And the score has said the video record where it's available, the events at issue can eliminate the factual disputes that would otherwise exist. So the video actually contradicts the testimony of the arresting officers with respect to three key points. Both officers testified that Mr. Gay was hunched when he moved away from the car on the night of May 31st. And Mr. Gay is captured by the dash cam as he gets out of the car and he is not hunched. In fact, his posture is identical to when he later appears on Officer Sailor's body cam, at which point under the government's theory, he no longer has the gun. Second, Officer Sailor testified that Mr. Gay fell near the spot where the gun was found. But the video from the dash and the body cam only showed Mr. Gay walking upright and holding his arms normally. There's a five second window between when Mr. Gay is last seen on the dash cam and when he's first seen on Officer Sailor's body cam. That leaves only five seconds for Mr. Gay to travel approximately 50 or 60 feet down the path, turn the corner of the detached garage and fall flat on the ground with his chest down and his arms out and to get back up again. To explain why Mr. Gay is not shown on the video hunched or running or even falling, Officer Sailor testified that Mr. Gay got up within half a second to a second of falling flat out, chest down, arms out. And that's not just his best guess from memory alone, that's from his review of the video footage between the first and the second trial. Mr. Gay had to get up within half a second to a second to explain why the video doesn't show him running or falling or even hunched over, which for most people to fit the timeline put forward by the government's version of events would be physically impossible. And finally, Officer Sailor said he did not notice the gun on the ground when he was walking Mr. Gay back to the squad car because it was dark and because he was managing outbursts by Mr. Gay. However, the video evidence here does not show a gun on the ground. Not only does it not show a gun on the ground, it shows the area where the gun was later recovered was actually quite brightly lit. And Mr. Gay, it shows no outburst from Mr. Gay as they were walking past the area or rather directly over the area where the gun was later found. So the only corroboration put forward by the government is this... Counsel, why is corroboration even needed? There's direct testimony and the jury believed it. Isn't that a classic jury question? So three responses to that, Your Honor. Whatever factual disputes that the jury was asked to resolve, it still has to add up to guilt beyond reasonable doubt. There's proximity to the contraband here, which this court has repeatedly held is on its own insufficient to establish possession. But beyond that, the only corroboration admitted is the witness testimony of Mr. Gay's behavior. You're suggesting that corroboration is legally essential to a jury verdict and the law is pretty well established that it is not. I'm sorry, I didn't catch the first part of your question, Your Honor. You keep suggesting that is essential to the validity of a jury verdict and the law is very well established that it is not. What's the problem in this verdict even putting to one side the lack of direct video evidence? Well, we pushed back a bit on that characterization, Your Honor. We think the corroboration as we read the cases is essential. I know that a lawyer making an argument to a jury will stress the lack of corroboration. I'm asking why, as a matter of law, a jury could not find guilt without corroboration. Because the proximity alone, Mr. Gay's proximity... Proximity alone is not alone. As Judge Hamilton has already said, the evidence found in this gun, sorry, the ammunition found in this gun matched the ammunition found in Gay's motel room. Right? Alone is never the right way to look at evidence. You look at the whole body of evidence. Well, to your point about looking at the whole body of the evidence, Your Honor, this jury, the second jury who did convict Mr. Gay did not get to hear all of the evidence. So, I want to re-address that the government's case in the second trial, again, was similar in its trial. The difference was that the first jury heard key exculpatory testimony from several witnesses who were excluded from the second trial. So, even if the court does not agree that the evidence was insufficient to support a finding of guilt beyond a reasonable doubt, the district court's rulings ahead of the second trial effectively gutted Mr. Gay's defense case. And we know this excluded evidence mattered because the first jury who heard the exculpatory testimony could not convict, and the second jury who only heard evidence according to the government's inferences on critical issues convicted. Counselor, your client was able to elicit testimony regarding the events of May 23rd. That's what you're talking about, the exclusion regarding additional testimony of the events of May 23rd, but isn't it true that your client was able to elicit some testimony? Mr. Gay, that's correct that Mr. Gay was able to elicit testimony regarding the hotel key. However, the district court barred any other reference to the May 23rd incident. And we think that even aside from the hotel key, the May 23rd incident is exculpatory for at least two reasons. The May 23rd encounter showed the potential animus by the Rock Island Police Department against Mr. Gay, and particularly in light of his subsequent complaints, at least some of which we know made their way back to the department. And second, the May 23rd encounter showed that Mr. Gay had good reason to be wary of the police after a very recent negative encounter, which provided a plausible alternative explanation for his behavior on the night of his arrest and for wanting to keep the police out of his hotel room. And particularly because the government asked the jury to draw an inference from Mr. Gay's behavior in walking away from the traffic stop and from his attempts to keep the police out of the room, namely why else would he have walked away, why else did he want to keep the police from his room, because he had something to hide. That Mr. Gay should have at least been allowed to introduce evidence supporting a different inference, that he had a plausible innocent explanation for his behavior. And the reason provided by the district court for barring any reference, aside from the hotel key, to May 23rd was that it wasn't relevant, because it related to a civil suit Mr. Gay had filed against the department, but this ignored the exculpatory value of the May 23rd evidence. To the extent that Mr. Gay, the district court meant Mr. Gay might try to use the testimony in his civil suit, that rationale doesn't hold up either, since Mr. Gay already had the testimony from the first trial at that point. So really want to emphasize the May 23rd evidence, which on its own would be enough to interfere with Mr. Gay's right to present a complete defense and to warrant a new trial. In Holmes versus South Carolina, the Supreme Court held that exclusion of third-party guilt or evidence of third-party guilt on its own violated the defendant's right to have a meaningful opportunity to present a defense, even though that defendant was still allowed to attack the credibility of the prosecution's case, the forensic analysis, in other ways. The exclusion of that third-party guilt on its own was enough to interfere with that defendant's rights. And it's important to know as well that the forensic evidence in Holmes was overwhelming. Defendants' handprints were obscene, there were fibers from the victim on the defendant and vice versa, and this exculpatory evidence in our case is all the more important because in cases like this one, where the evidence is less than overwhelming, Mr. Gay was entitled to present the evidence of the May 23rd incident, both as a plausible, to supply a plausible explanation for his behavior and to show the past negative encounters with the Rock Island Police. And the district court also excluded, shortly before the second trial, testimony from Officer Foy, who had testified in the first trial. Officer Foy was a FOIA officer from the Rock Island Police Department and he had testified previously that the firearm was recovered in a high-service call area where Mr. Gay was arrested. So the relevance of the service calls was not disputed, nor was Officer Foy's testimony cumulative or otherwise inadmissible. Instead, the only reason the district court provided for excluding Officer Foy's testimony was that Mr. Gay could have obtained the testimony from a different witness, Detective Whitcomb. So not only is Mr. Gay entitled to exercise his judgment as to which witness to call, it's not at all clear from the record that Detective Whitcomb could have testified regarding the high-volume of service calls in the area. Ms. Zhang, is it correct that the district judge allowed some of the call logs to be admitted, but that Mr. Gay, acting as his own attorney, never actually put that into evidence? Mr. Gay did use the call log in the first trial. In the second trial, he was not able to figure out how to use the call log with Detective Whitcomb, and it's not clear that Detective Whitcomb had direct knowledge of the... Did he make an... Sorry, but did he make an effort to put the call log into evidence in the second trial? Not the call log itself, Your Honor. Okay. Given that, why should we be terribly concerned about the choice between Foy and Whitcomb for making the same general point if he had that path open to him? Well, two responses to that, Your Honor. First, we don't think that Mr. Gay necessarily could have made the same point through Detective Whitcomb. Detective Whitcomb had been the detective responsible for investigating the firearm charge, but Officer Foy was uniquely situated to testify to the volume of calls and explain, as he did in the first trial, some of that context that the calls for ambulance assistance or shots fired, that only one reason could be supplied for each call, which the government tried to undermine by saying these could have been calls for any particular reason, not necessarily involving firearms. And second, that was Mr. Gay's call to make. He had the benefit of the prior testimony from Officer Foy. If Officer Foy had deviated from the prior testimony, he would have had the transcripts available. That decision ultimately should have rested with Mr. Gay, particularly since there's no dispute as to the relevance or the exculpatory value of the call log information. And particularly since this ruling came ahead of the second trial, there was no reason to say that Officer Foy's testimony might have been cumulative of Detective Whitcomb's, which it ultimately wasn't. And we would also just emphasize that the expedited retrial date left Mr. Gay only three weeks to amounted to his complete defense case. There were three defense witnesses who were excluded. He was not allowed any reference to the events of May 23rd. He was proceeding pro se, and the expedited retrial date meant that standby counsel was also unavailable. If the Court has no other pressing questions about the excluded evidence from the second trial, we'd like to reserve the remainder of our time for rebuttal. Certainly, Counsel. Mr. Simpson. Good morning. Your Honors, may it please the Court, I'm Scott Simpson on behalf of the United States. We have basically six claims here from the appellant's brief, and I intend to focus on four or five depending on the Court's questions and depending on how much time we have. In this order, if it's all right with the Court, the sufficiency of the evidence, the motion to suppress in relation to the hotel room, the scheduling of the retrial, and I'm not sure how interested the Court is in that issue. I'll touch on that briefly unless there are questions, and the District Court's exclusion of certain testimony. If there's time at the end, we could talk about the Second Amendment claim, but I didn't hear any argument from defense counsel. I do not plan to address the motion for new trial based on newly discovered evidence unless there's any question on it. Mr. Simpson, I have for you the same observation I did for Ms. Zheng. It's a very big room. That microphone is not for amplification, and your voice is just ailing. I apologize, Your Honor. Thank you for telling me that. I'll be careful with that. On the sufficiency of the evidence, it's up to the jury, of course, as the Court has already observed, to weigh the evidence, and the jury in this case found the evidence sufficient on both the firearm charge and the ammunition charge. The jury obviously believed Officer Saylor's testimony about Mr. Gay's flight from the traffic stop, and the body cam video is simply too short to undercut any of that testimony. Mr. Gay ran from a traffic stop as a passenger. He reached toward his waistband as he ran hunched over. He fell as he was running, and there was a freshly placed gun on the ground right where he fell. That was Officer Saylor's testimony, and again, in fact, the dash cam video, I believe defense counsel referred to that, the dash cam video showed him for only a second, if that much, and again, in relation to Mr. Gay falling as he rounded that garage, that detached garage, Mr. Gay rounded the garage in front of Officer Saylor, so Officer Saylor was running straight ahead, and obviously the body cam video only points straight ahead. Mr. Gay fell before Officer Saylor had rounded that garage, and so reasonably, it's not surprising that the body cam video could not catch the actual fall. The jury also heard, as particularly Judge Hamilton has referred to, the jury also heard testimony about the characteristics of the ammunition in the gun and the ammunition found in the hotel room. The two sets of ammunition matched exactly down to the head stamps on the we put pictures in our brief depicting that ammunition, and it's startling and striking how much they match, and further as to the ammunition charge itself, Mr. Gay was the only occupant of room 133, and his property lay undisturbed in that room from when the hotel deadlocked the room after Mr. Gay's arrest until the management found the bullets in there two comments on the motion to suppress the bullets found in the hotel room. Mr. Gay acknowledged to the hotel manager on their phone call while Mr. Gay was in jail that his rental period ended on June 1st. He had paid only up to that day, and the case law is clear that a hotel guest loses any expectation of privacy at that point, and even aside from the lack of any expectation of privacy, the hotel management had apparent authority to consent to the police officer's entry into the hotel room. The manager told Officer Mendoza that Gay's rental had expired, and the officer saw the manager use a metal key to get into the room. If you look at Officer Mendoza's body cam video, it's fairly striking how much the manager of the hotel had to do to get into that room using a metal key before she could use a magnetic key card. Can you clarify this though for me, Mr. Simpson? Was the ammunition found for the first time when Officer Mendoza was present? No, your honor. It was found while the... so they got the call on June 1 saying that Mr. Gay was in jail. They wanted to wait for a while to clear out the room because Mr. Gay was so particular about people coming into rooms he had occupied. It was pretty unusual though that they were willing to leave it empty for 14 days. Leave it unused? Yes, it is. But the testimony was that as the busy summer season approached, what they had been saying to Mr. Gay and to his girlfriend and to another woman who came to get Mr. Gay's property was bring the police or have a court order. They wanted that kind of protection and so they were waiting. But then as the busy summer season approached, they said they testified June 14th we're going to go ahead and clear out that room. The testimony was that Mr. Gay's property had remained undisturbed in the room up to that time. Next issue is the, and I think I suspect I only need to spend very little time on this unless the court has questions on it. The next issue is the scheduling of the retrial. I would be shocked if this court has ever reversed a conviction based on a challenge to a scheduling decision by a district court. No surprise, this court has said those decisions... I hate to shock you but I know of at least one time we did that. Is that right? Is that right? Interesting. I'd like to know of the, we don't have time but I'd like to know about the background for that case. This court has said that those scheduling decisions are almost unreviewable and that the lower court's decision is almost standardless. And there's no basis, of course, for a finding of arbitrary or abusive action here. Mr. Gay, I'll go ahead and talk about a little bit of the background in relation to the scheduling. Mr. Gay was indicted in July 2022 and the first trial didn't happen until almost two years later in April 2022. And that was largely because of Mr. Gay's many pro se filings, his requests for continuances, and just multiple changes of counsel. Mr. Gay went through several attorneys. And I should add that Mr. Gay was on bond that entire time. As the district court said in scheduling the retrial, the parties obviously had already gone through an entire trial. The retrial was initially scheduled for May 31st and I should point out that was without objection from the defense. We're only talking here about two weeks. The judge decided to move that trial up by two weeks because the court later realized, as the court said from the bench, later realized that that May 31st scheduling presented an issue regarding the availability of potential jurors because that would be right after the Memorial Day holiday. The court was also concerned about some scheduling issues later in the spring and about speedy trial issues. Now, of course, that time before the retrial would have properly been excluded, but the court was especially cognizant of potential speedy trial issues because earlier in the long history of the case, Mr. Gay himself had sought to include even excludable time in the speedy trial clock. That was contrary at that time to the advice of his counsel when that happened, that he was represented by counsel. Next, I'll talk about the exclusion of certain testimony. That was also well within the court's discretion. This goes to the core of the district court's function as the evidentiary gatekeeper. The judge is entitled, I would almost say we would say required, to prevent sideshows from developing during a trial. I'm talking about two categories of evidence. Additional testimony about that encounter of May 23rd, a week earlier, Mr. Gay's encounter with the police, and testimony from the FOIA officer, Jason Foy. The judge heard all of that testimony during the first trial, so he was particularly able to make the assessment that the evidence was irrelevant, or at least that any probative value was substantially outweighed by potential for confusion, the issues, misleading the jury, wasting time, and so forth. Before the first trial, there was actually motion practice about, so on the first category of evidence, the May 23rd encounter, talking about two witnesses, Scott Gable, a Rock Island police officer who was involved in that May 23rd episode, and Dora Villarreal, who was actually the state's attorney for Rock Island County, who was required to testify in the first trial. There had been motion practice on that before the first trial. In fact, both Gable and Villarreal had filed motions to quash subpoenas against him, but the court nonetheless, in the first trial, enforced the subpoenas, and both Gable and Villarreal testified. But the court found, so the court was able to hear that testimony, and that allowed the court to make a better assessment as to the value or lack of value of that testimony. The court found that Mr. Gay was attempting to try his civil rights claim as part of his criminal case. He had filed a civil witness, as we're talking about. Officer Gable was actually one of the defendants in that civil rights case, so not surprising that the court was concerned about that, trying to try the civil rights case as part of the criminal case. Also, another very striking fact is that in that civil rights case, the parties reached a settlement of the case on May 19, 2022. That was actually the last day of the retrial in this case. So again, the concern about attempting to try the civil rights case as part of the criminal case was very well-founded. Mr. Simpson, could I ask you about the district judge's post-trial order here, where he was addressing those rulings? I kept looking for a citation, the Federal Rule of Evidence 403, and didn't see it. What should we make of that? Your Honor, I looked at all the transcripts. I can't remember that particular transcript, but the court did talk about that kind of thing, and I can't remember even in this. It was a pretrial hearing on April 27, 2022, where these issues were discussed, and the court did talk about, I'm not sure, he actually did refer specifically to 403. I was looking at the post-trial written entry. I have not yet seen that transcript of the pretrial. Okay. In that pretrial, on April 17, 2022, the court did talk about, for example, on page 7, referring to Mr. Gable, he said, I allowed evidence in the first trial, based upon representations and findings that there would be some relevance with regard to Gable, the stop and seizure of Mr. Gay's hotel key, I believed to be relevant to Mr. Gay's theory of the case. However, during Gable's testimony, no one connected the hotel key that was taken from Mr. Gay to the American Motor Inn in Room 133. In fact, the hotel key has a different name on it. And again, on the next page, page 8, the judge says, Mr. Gay, nobody asked Mr. Gable. You did not ask Mr. Patel if that key was from the American Motor Inn. There was no testimony that that key was to Room 133. Without that testimony and without that evidence, then I don't think he referred specifically to Room 403, but I think he's making the findings that that evidence... Can I ask you one other question about the exclusion of some of that evidence? And that is, it was a little unusual, at least to me, to see the district judge saying, well, you can't call FOI, but you can put the same points in through a different officer. And ordinarily, we would think that a side gets to choose its own, its witnesses. Your Honor, I think there was, again, that was partly a balance of the potential probative value, balancing that against the potential for wasting time and so forth. And part, besides actually, besides the question as to Mr. FOI, the FOIA officer, the court was also had in mind an issue as to the length of the period to be looked at for other service calls to the area of the May 31st arrest. In the first trial, there was, I believe I have somewhere here, I have the actual... There was a list that was brought in in the first trial in relation to service calls. Here it is. It was, and I believe, this would be, it was R-320 on the district court docket, and this was from the first trial. This was actually an exhibit to the government's motion in Lemony, but I believe in the first trial, this was let in. What Mr. Gay wanted to bring in was that list of service calls. It covered a five-year period. And so, part of the issue, besides Mr., the relevance of the need for Mr. FOI's testimony, part of the court, the issue the court was looking at was whether we should let in service calls for a five-year period. And the court, the court found that that would be, that that was irrelevant. I understand that. I'm not sure how that though deals with this approach to the district judge saying don't call that witness, call this one. Your Honor, I guess I was going to and I think this ties into the judge's feelings, the judge's reactions. I was going to bring this up at the end of discussing the whole issue, all the issues of exclusion of evidence of testimony. Besides being the evidentiary gatekeeper, the judge is also entitled, and again we might say required to prevent the mistreatment of witnesses as there was a lot of back and forth as the court might have seen looking at that hearing and conference transcripts. There's a lot of back and forth between the judge and Mr. Gay representing himself and in discussing the handling of witnesses with the judge on the first day of retrial. I'm talking about the first day of comments that Mr. Gay had made earlier I believe also on that first day of retrial in discussing bringing in witnesses and I believe, I believe this did refer specifically to Mr. Foy if I remember correctly. In discussing the handling of witnesses, Mr. Gay openly said he wanted to have witnesses come to the court and wait in the courthouse for their turn to testify because he wanted the witnesses to suffer, quote unquote, and I think that that tied in somewhat to the judge's ruling. That kind of thing was especially concerning here because this was a case from from Rock Island, occurred in Rock Island, so most of the most of the judges were most of the witnesses were in Rock Island, but it had to be had to be held in Peoria, the trial, so most of the witnesses had to drive down from Rock Island to Peoria for the trial. So the judge, the judge certainly had that that problem in mind and I believe, yes, Mr. Jason Foy was the FOIA officer for the Rock Island Police Department, so he would have had to come down from Peoria, I'm sorry, from Rock Island. So the judge was cognizant of that problem too and of course Mr. Foy's only purpose of Mr. Foy's testimony was to authenticate that printout of five years worth of service calls and very reasonably, not surprisingly, the district court held that five years of service calls was irrelevant and that's why the court, the judge said you can elicit testimony. What the what the judge suggested was elicit testimony from Detective Whitcomb, who's from Rock Island, and Mr. Gay, besides that option, he had three other Rock Island police officers on his stand at various times, Officer Saylor, Officer Costas, and Officer Mendoza. He could have asked any of them about other service calls in that area of than he did have to have that testimony read. third part of my testimony is one point your honor, I think Mr.Dickens or my only point of purports to be asserting that 922g is unconstitutional as applied to him. They reiterate in their in their opening brief and in their reply brief that it's an as applied challenge but he has not developed that argument at all even in his reply brief even after we pointed out that problem in our in our response brief even in his reply brief Mr.Gay still did not try to establish that he is a law-abiding citizen for purposes of a second amendment as applied challenge and besides all of that we encourage the court if it is if it's going to address the merits of the second amendment claim to thank you Mr. Simpson thank you Ms. Yang anything further thank you very briefly your honor Mr. Simpson discussed what the video does not show and we just want to be clear we are talking about what the video does show and these are not the same sort of factual disputes that the jury might otherwise be asked to resolve between for example conflicting witness accounts the video eliminates any dispute as to several basic facts relied upon by the government Mr. Simpson also mentioned the bases for the district court's ruling on the May 23rd evidence just like to note that the burden is not on Mr.Gay to establish conclusively that the same officer who sees the in any event the key card itself came in in the second trial that was not the only value in the May 23rd evidence and with respect to the sideshow concern the May 23rd evidence came in in the first trial and it wasn't a sideshow it wasn't unmanageable in fact the first trial didn't take any longer than the second trial and with respect to the district court's basis for excluding officer Foy the comment about wanting witnesses to suffer was taken out of context just now this was not the reason that Mr. Gay cited for wanting to call officer Foy as a witness and that comment was in the district court's rulings excluding officer Foy along with the May 23rd evidence what's the context in which it's appropriate we're not asserting that it was appropriate only that wasn't the basis for the district court's decision to exclude officer Foy and and ask that Mr. Gay elicit the same testimony from detective Whitcomb we don't think the court needs to reach the second amendment issue but we're happy to apply a supplemental briefing on that necessary but otherwise for the reasons discussed today and stated in our brief we would ask that this court set aside Mr. Gay's convictions for possession of a firearm possession of ammunition well thank you very much Ms. Yang we appreciate your willingness and that of your law firm to assist the defendant and the court in this case the case is taken under advisement